# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: February 22, 2021

```
* * * * * * * * * * * * * * * *
DONNA WISSBAUM,              *      No. 17-1531
                            *
            Petitioner,      *      Special Master Sanders
                            *
v.                          *
                            *      Attorneys' Fees and Costs;
SECRETARY OF HEALTH          *      Reasonable Basis; Influenza ("Flu")
AND HUMAN SERVICES,          *      Vaccine; Pneumococcal Vaccine;
                            *      Neuromyelitis Optica ("NMO");
            Respondent.      *      Significant Aggravation.
* * * * * * * * * * * * * * * *
```

*John F. McHugh,* Law Office of John McHugh, New York, NY, for Petitioner.
*Althea W. Davis,* U.S. Department of Justice, Washington, DC, for Respondent.

## ATTORNEYS' FEES AND COSTS DECISION[1]

On October 16, 2017, Donna Wissbaum ("Petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program ("Program" or "Vaccine Program").[2] Petitioner alleged that the pneumococcal and influenza ("flu") vaccines she received on October 22, 2014, caused her to suffer "a significant aggravation of her underlying condition of neuromyelitis optica[3] ("NMO")[.]" Pet. at 1, ECF No. 1. On August 22, 2019, Petitioner filed a motion to dismiss indicating that after consulting with a second expert, "[P]etitioner does not believe she has reasonable cause to proceed further." Pet'r's Mot. to Dismiss, ECF No. 34. I granted Petitioner's motion and dismissed her claim on August 26, 2019. *See* Decision, ECF No. 35.

---

[1] This Decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").

[3] Neuromyelitis optica ("NMO") is defined as the "combined, but not usually clinically simultaneous, demyelination of the optic nerve and the spinal cord; it is marked by diminution of vision and possibly blindness, flaccid paralysis of the extremities, and sensory and genitourinary disturbances. Called also Devic disease[.]" *Dorland's Illustrated Medical Dictionary* 1263, 1267 (32nd ed. 2012) [hereinafter "*Dorland's*"].

On January 9, 2020, Petitioner filed a motion for attorneys' fees and costs, seeking **$13,344.25** in attorneys' fees and **$3,500.00** in costs for her attorney, John F. McHugh. Pet'r's Mot. for Attys' Fees and Costs at Ex. 1, ECF No. 38 [hereinafter Pet'r's Mot. for AFC]. Petitioner also seeks an award of **$2,972.00** in attorneys' fees and **$284.83** in costs for her prior attorneys at the law firm of Krueger & Hernandez. *Id.* at Ex. 2. On January 31, 2020, Respondent filed his response to Petitioner's motion, objecting to "an award of attorneys' fees and costs in this case as the case lacked a reasonable basis when filed." Resp't's Resp. at 8, ECF No. 39. Alternatively, Respondent "opposes an award [] for all work done after the Rule 5 conference on October 24, 2018." *Id.* Petitioner did not file a reply brief. For the reasons stated below, I find that Petitioner has not satisfied the statutory requirements for an award of attorneys' fees and costs; therefore, I **DENY** Petitioner's motion.

## I.    Procedural History

Petitioner filed her petition for compensation on October 16, 2017. Pet. at 1. At the time the petition was filed, Petitioner appeared *pro se*. *See id.* On January 3, 2018, Petitioner filed a consented motion to substitute attorney Stephanie A. Schmitt of the firm of Krueger & Hernandez, in place of Petitioner. ECF No. 8. Petitioner's request was granted. *See* ECF Nos. 9–10. On February 19, 2018, Petitioner submitted six exhibits in support of her petition consisting of medical records and a statement of completion. ECF Nos. 12–13.

Respondent filed his Rule 4(c) report on September 24, 2018, and recommended against compensation. Resp't's Report at 1, ECF No. 19. Respondent argued Petitioner's claim with respect to her pneumococcal vaccine should be dismissed because it is a non-covered vaccine. *Id.* at 18. Further, Respondent argued Petitioner's claim that her flu vaccine caused the significant aggravation of her NMO must also fail because she has not established causation-in-fact. *Id.* at 18–21. Respondent also argued that Petitioner failed to provide a medically acceptable timeframe within which her injury could be ascribed to her flu vaccine. *Id.*

I held a status conference pursuant to Rule 5 with the parties on October 24, 2018. *See* Min. Entry, docketed Oct. 24, 2018. Attorney Andrew Krueger appeared in place of Stephanie Schmitt for Petitioner, and Althea Davis appeared for Respondent. *See* Sched. Order at 1, ECF No. 20. During the conference, Petitioner conceded that the Court did not have subject matter jurisdiction over Petitioner's claims related to the pneumococcal vaccine. *Id.* In relation to Petitioner's claim regarding the flu vaccine, I explained "that NMO is a disease that has a tendency to relapse, especially if a patient does not receive continued treatment as soon as possible." *Id.* I noted that Petitioner "had stopped taking her medication for several days and had begun to relapse prior to her vaccination." *Id.* I further noted that her "symptoms subsided with renewed treatment." *Id.* I highlighted that Petitioner had declined continued treatment for her condition. *Id.* After discussing those issues with the parties, I reminded Petitioner that "temporal association does not establish causation and that the claims of a Petitioner, unsubstantiated by medical records or opinion, do not establish entitlement." *Id.* I informed Petitioner that "reasonable basis may be questioned going forward in this case, particularly if no expert is obtained." *Id.* at 1–2. Nonetheless, Petitioner indicated a desire to retain an expert and requested ninety days to do so, or until January 22, 2019. *Id.* at 2. I granted Petitioner's request without objection. *Id.*

On December 31, 2018, attorney John McHugh submitted a motion seeking "to take over [this] case from the office of Andrew Krueger, Esq." ECF No. 21. Due to several consecutive filing errors in Mr. McHugh's motion, he was required to refile his motion two separate times. *See* ECF Nos. 21–25. Therefore, the Court did not grant his request to substitute as counsel until March 1, 2019. ECF No. 25. Within Mr. McHugh's motion, he asked the Court to extend the deadline for Petitioner's expert report by "[sixty] days from the date such application is granted." *Id.* at 1–2. In granting his motion to substitute as counsel, the Clerk of Court also granted Mr. McHugh's request for an extension. *Id.* As a result, Petitioner's deadline to file an expert report was extended until May 1, 2019. *See* Order, ECF No. 27. Petitioner missed this deadline.

On June 4, 2019, Petitioner filed a motion for extension of time until August 15, 2019, to file an expert report. ECF No. 26. Petitioner indicated that "[t]here is a reasonable basis issue in this case and [she] ha[s] asked for a preliminary opinion from [her] expert before [she] commit[s] significant funds to obtaining a written opinion."[4] *Id.* at 1. On June 5, 2019, I granted in-part Petitioner's motion for an extension of time to file her expert report. Order, ECF No. 27. I noted that Petitioner had been afforded "two-hundred and twenty-four days to file an expert report addressing concerns raised in the Rule 5 conference[]" but had not done so. *Id.* at 1. I therefore ordered Petitioner to submit an expert report by no later than July 5, 2019. *Id.* at 2.

Petitioner missed her July 5, 2019 deadline. On July 10, 2019, Petitioner moved for leave to file her status report out of time. ECF No. 28. In her status report, Petitioner indicated that the preliminary opinion of her expert was that "[Petitioner] must add another expert to the team to proceed[.]" *Id.* at 1. As a result, Petitioner would need additional time to locate that expert. *Id.* In response, on July 11, 2019, I issued an order to show cause, declining to extend Petitioner's deadline for filing an expert report. ECF No. 29. Instead, I ordered Petitioner to show cause why her case should not be dismissed for failure to prosecute. *Id.* at 2. I warned Petitioner that failure to file an expert report by August 9, 2019, would result in an order dismissing her case. *Id.*

On August 1, 2019, Petitioner filed a status report expressing she was now "seeking to mediate this case[.]" ECF No. 30 at 1. Petitioner explained that "the facts known indicate that the damages attributable to the vaccine injury are not significant enough to justify the expense to be imposed on the [P]rogram by [P]etitioner's employing experts."[5] *Id.* Petitioner indicated that after her current attorney, Mr. McHugh, had "time to study this matter and to consult informally with relevant experts, the [P]etitioner now seeks mediation as though [P]etitioner had reasonable cause to bring this action and has stated a claim for damages . . ." related to vaccine causation. *Id.* at 4. As an alternative to mediation, Petitioner moved for an order from me stating that "as of this submission[, Petitioner] had reasonable cause to proceed and to retain the expert help needed to proceed." *Id.* at 10.

Instead, on August 6, 2019, I issued a second order to show cause. ECF No. 31. In my order, I concluded that Petitioner's status report was non-responsive to my initial show cause order. *Id.*

---

[4] Petitioner's billing records note that Petitioner's counsel did not contact Dr. Shoenfeld with a summary of the case and requesting a possible opinion until June 7, 2019. Pet'r's Mot. for AFC at Ex. 2, pg. 2.

[5] Petitioner's billing records note that Petitioner's counsel received a preliminary opinion from Dr. Kinsbourne regarding the impossibility of Petitioner's claim on July 27, 2019. Pet'r's Mot. for AFC at 3, Ex. 2, pg. 2.

at 1. I explained that "I have already alerted Petitioner to a possible reasonable basis issue in my order dated June 5, 2019, and I will not make a final reasonable basis determination in a vacuum[,]" as Petitioner requested. *Id.* I awarded Petitioner one final opportunity to show cause why her case should not be dismissed. *Id.* at 2. I ordered her to submit an expert report by August 12, 2019, and informed her that I would dismiss her case for failure to prosecute if she did not comply. *Id.*

On August 7, 2019, Petitioner filed a motion to dismiss indicating that "[she] has been informed that the government questions whether reasonable cause existed to file this action." ECF No. 32. Petitioner confirmed that she "underst[ood] that as causation is immune and the injury is neurological, two medical experts will be required to prosecute this matter." *Id.* at 1–2. Therefore, "[P]etitioner cannot risk incurring the cost of those expert reports." *Id.* at 2. Thus, Petitioner moved for a decision dismissing her claim. *Id.* I held a status conference with the parties on August 16, 2019, for further information regarding Petitioner's motion. *See* Min. Entry, docketed Aug. 16, 2019.

Petitioner filed a second motion to dismiss on August 22, 2019. ECF No. 34. In her motion, Petitioner indicated that "[i]t was not apparent until we consulted with a second expert, a neurologist, that this claim could not be proved." *Id.* at 1. Petitioner conceded that the expert preliminarily opined that "it was impossible to isolate the likely vaccine injury from the resurgence and worsening of her pre[-]existing disability caused by termination of steroid treatment." *Id.* at 2. Petitioner concluded that "having received these opinions [she] does not believe she has reasonable cause to proceed further." *Id.* Petitioner again moved for an order dismissing her claim. *Id.* I dismissed Petitioner's claim for insufficient proof on August 26, 2019. *See* Decision, ECF No. 35.

On January 9, 2020, Petitioner filed a motion for attorneys' fees and costs for both firms who represented her. Pet'r's Mot. for AFC at 5–6. Petitioner seeks an award of **$16,844.25** in fees and costs for her attorney, Mr. McHugh, and an additional award of **$3,256.83** in fees and costs for the Krueger & Hernandez firm. *Id.* On January 31, 2020, Respondent filed his response to Petitioner's motion, objecting to "an award of attorneys' fees and costs in this case as the case lacked a reasonable basis when filed." Resp't's Resp. at 5. Petitioner did not file a reply brief. This matter is now ripe for consideration.

## II.    Medical History

### a.  *Medical Records: pre-vaccination*

Petitioner was born on December 3, 1956. Pet'r's Ex. 2a at 40, ECF No. 12-2. In October 2014, at the time of vaccination, she was fifty-seven years old and worked as an attorney. *Id.* Petitioner's pre-vaccination history is relevant for various issues with her vision including optic neuritis. *Id.* at 1, 41. On February 20, 2012, Petitioner presented to optometrist Dennis Harkins for a complete eye exam. *Id.* Petitioner noted that her vision was blurry at some angles while wearing glasses. *Id.* at 1. She also reported a medical history of "[m]igraine without aura, without mention of intractable migraine without mention of status migrainosus[]" and eustachian tube dysfunction. *Id.* Her vision was 20/20. *Id.* at 5. Dr. Harkins assessed Petitioner with hypermetropia.[6] *Id.* at 2.

---

[6] Hypermetropia is also referred to as "hyperopia" and is defined as "an error of refraction in which rays of light entering the eye parallel to the optic axis are brought to a focus behind the retina, as a result of the

On December 23, 2013, Petitioner again visited Dr. Harkins and complained of blurry vision in her right eye. *Id.* at 40. Petitioner reported that her blurred vision had been occurring "for awhile, [sic] maybe months," but that in the last week, she started having blurred vision in the top half of her vision that "bother[ed] her ability to work." *Id.* Dr. Harkins assessed Petitioner as having blurred vision in her right eye, drusen (degenerative) of retina,[7] visual field loss, rapid afferent pupillary defect,[8] hyperopia[9] with astigmatism,[10] and presbyopia.[11] *Id.* at 41. He referred her to Dr. Robert Weir for treatment of "suspected optic neuritis." *Id.*

The next day, on December 24, 2013, Petitioner presented to ophthalmologist Dr. Weir for suspected optic neuritis. *Id.* at 69. Petitioner reported that the "[t]op half of [her] vision in [her] right eye seems wavy," and that she noticed the change "about [one] week ago and thought it was due to cold medications." *Id.* Testing confirmed the partial loss of vision in her right eye, with normal vision in her left eye. *Id.* at 69–70. A brain MRI was conducted on December 31, 2013, and showed "mild[,] scattered[,] non[-]specific white matter signal abnormality[]" that "could potentially represent demyelinating process given right optic neuritis." *Id.* at 112.

Petitioner followed-up with ophthalmologist Dr. Judith Fitzgerald on December 31, 2013, to discuss the results of her MRI. *Id.* at 129. Dr. Fitzgerald definitively diagnosed Petitioner with optic neuritis and possible multiple sclerosis ("MS"). *Id.* at 130. Dr. Fitzgerald prescribed Petitioner steroid infusions for the subsequent three days, and prednisone for eleven days following the infusions. *Id.* at 130–131. Dr. Fitzgerald referred Petitioner to Dr. Frost, a neurologist, for work-up of her possible MS. *Id.* She also ordered an MRI of Petitioner's cervical region to rule out transverse myelitis. *Id.* On January 1, 2014, Dr. Fitzgerald informed Petitioner that "there was no transverse myelitis but that there was a fair amount of arthropathy[12] in the cervical region." *Id.* at 143. Dr. Fitzgerald noted that Petitioner "reported that she now has no pain and that she can see blues and greens now but no reds and that the central vision is a little better." *Id.* Petitioner continued her steroid treatment. *Id.*

On January 6, 2014, Petitioner reported to Dr. Sarah Groskreutz for follow-up for her optic neuritis. *Id.* at 148. During this visit, Petitioner indicated she had received three steroid infusions beginning on January 1, 2014, and was taking oral steroids. *Id.* Petitioner further reported that she was "[s]till unable to see reds (things appear to be brown)" and bright light continued to bother her. *Id.* On January 17, 2014, Petitioner presented to neurologist Dr. Natasha Frost. *Id.* at 156. Dr. Frost noted that Petitioner's vision was slowly improving following treatment with steroids based

---

eyeball being too short from front to back . . . [c]alled also *farsightedness* . . . ." *Dorland's* at 892 (emphasis in original).

[7] Drusen (degenerative) of retina refers to "yellow deposits that form under the retina[.] They usually result from aging, but sometimes occur with pathologic conditions . . . ." *Dorland's* at 568.

[8] Rapid afferent pupillary defect is a test used to detect Marcus Gunn pupil. Marcus Gunn pupil is defined as "the defect of pupillary movement . . . ." *Dorland's* at 1556.

[9] *See supra* note 6.

[10] Astigmatism is "an error of refraction caused by unequal curvature of the refractive surfaces of the eye, so that a point source of light cannot be brought to a point focus on the retina but is spread over a more or less diffuse area." *Dorland's* at 168.

[11] Presbyopia is defined as "hyperopia [farsightedness] and impairment of vision due to advancing years or to old age[.]" *Dorland's* at 1511.

[12] Arthropathy is defined as "any joint disease." *Dorland's* at 158.

on Petitioner's assertion that she was feeling "90% better[,]" with "[n]o pain[ or] other symptoms." *Id.* Petitioner indicated "a little abnormality in color vision." *Id.*

Petitioner followed up with Dr. Weir on April 24, 2014. *Id.* at 178. During this visit, she reported "feeling good" and that her vision was "fine" with glasses. *Id.* Petitioner reported "[n]o problems at this time." Dr. Weir noted that Petitioner's optic neuritis had "resolved[.]" *Id.* at 179. Petitioner was advised to return for a complete eye exam in a year. *Id.*

On June 8, 2014, Petitioner reported to the emergency room with a complaint of abdominal pain for four days. Pet'r's Ex. 3 at 67–72, ECF No. 12-4. Petitioner was diagnosed with back and abdominal pain, but no etiology was determined. *Id.* at 73. Petitioner had a follow-up for these complaints on June 27, 2014, with PA Kelin O'Donnell. Pet'r's Ex. 2a at 315. During this visit, Petitioner reported "[r]ecurrent abdominal bloating/pain with nausea and stool changes." *Id.* at 316. A colonoscopy performed on July 21, 2014, revealed "some focal 'acute' inflammation as well as mild 'chronic' inflammation." *Id.* at 422–23.

On August 18, 2014, Petitioner presented to the emergency room with a three-day history of "right thigh numbness" and stated her "sensation is '70%' compared to [her] left leg." Pet'r's Ex. 3 at 95. Petitioner also reported she developed right hip pain, as well as back and abdominal pain with "associated abdominal bloating." *Id.* Petitioner's admission notes indicate her history of optic neuritis. *Id.* Following several exams and tests, including x-rays, Petitioner was diagnosed with "[t]horacic and lumbar muscle spasms[,] meralgia paresthetica[,][13] [and c]onstipation." *Id.* at 100. On August 21, 2014, Petitioner returned to the emergency room for "lower extremity numbness and inability to empty bladder." *Id.* at 121. She reported "the numbness has gotten worse to the point where she is having difficulty walking . . . ." *Id.* An MRI of Petitioner's thoracic spine revealed "diffuse lesions along the spinal cord possibly consistent with demyelinating disease." *Id.* at 126. Petitioner was admitted for further work-up. *Id.* Petitioner's treating neurologist's diagnostic impression was "thoracic myelitis in the context of a prior episode of optic neuritis last winter." *Id.* at 129. Petitioner's treating neurologist further noted her "differential diagnosis strongly suggests either [MS] or [NMO]." *Id.* Petitioner was discharged on August 27, 2014, and was on a high-dose prednisone taper after completing five days of IV Solumedrol[14] therapy. *Id.* at 138, 141. Petitioner indicated an improvement in her lower extremity numbness. *Id.* at 138.

On September 4, 2014, Petitioner returned to Dr. Frost to follow up on her hospitalization. Pet'r's Ex. 2a at 442. During this visit, Petitioner reported she is "slowly [h]er NMO antibody [was] weak and using a walker." *Id.* Dr. Frost informed Petitioner that "[h]er NMO antibody [was] positive and based on this, her current episode of extensive [TM] and her prior optic neuritis . . . she has [NMO] . . . ." *Id.* Dr. Frost instructed Petitioner to continue the steroid taper and to start

---

[13] Meralgia paresthetica is "a type of entrapment neuropathy caused by entrapment of the lateral femoral cutaneous nerve at the inguinal ligament, causing paresthesia, pain, and numbness in the outer surface of the thigh in the region supplied by the nerve." *Dorland's* at 1136.

[14] Solumedrol is a "trademark for a preparation of methylprednisolone sodium succinate." *Dorland's* at 1731. Methylprednisolone sodium succinate "is chiefly used for the rapid achievement of high blood levels of methylprednisolone in short-term emergency treatment; administered by intramuscular or intravenous injection." *Dorland's* at 1154. Methylprednisolone is generally used "as an anti[-]inflammatory and immunosuppressant . . . ." *Id.*

Imuran,[15] but Petitioner indicated she wished to defer treatment with Imuran pending an evaluation at the Mayo Clinic. *Id.* at 442, 460.

On October 13, 2014, Petitioner presented to neurologist Dr. Deena Nasr at the Mayo Clinic for a second opinion regarding her NMO diagnosis and treatment options. Pet'r's Ex. 4 at 47. Dr. Nasr noted that the onset of Petitioner's optic neuritis occurred in late December 2013. *Id.* She further indicated that following treatment with IV steroids, "[Petitioner's] vision was back to baseline within two weeks from onset." *Id.* Petitioner underwent a full exam. *Id.* at 48. The exam revealed Petitioner had "absent vibration at the toes up to the knees. 50% loss of the proprioception at the toes. Diminished pinprick in bilateral lower extremity with T8 sensory level on the right . . . [g]ait was not assessed as [Petitioner] got flexor spasms every time she was asked to stand." *Id.* Based on this exam, Dr. Nasr confirmed Petitioner's NMO diagnosis and diagnosed her with paroxysmal flexor spasms.[16] *Id.* at 48–49. Dr. Nasr ordered additional lab tests, including repeat ANA and NMO antibody screenings, and prescribed Tegretol.[17] *Id.* at 49. The same day, Petitioner saw a second neurologist, Dr. Brian Weinshenker, at the Mayo Clinic. *Id.* at 50–52. Dr. Weinshenker indicated that "[t]here is little doubt of the diagnosis of [NMO]." *Id.* at 52. He recommended treatment with azathioprine combined with corticosteroids, but Petitioner expressed a desire to try rituximab[18] first. *Id.* Prior to starting such treatment, Dr. Weinshenker further recommended that Petitioner receive both the pneumococcal and inactivated flu vaccines but stated she should not receive live vaccines. *Id.*

On October 22, 2014, Petitioner reported to Dr. Marjorie Dimaggio to establish care. Pet'r's Ex. 2a at 495. During this visit, Petitioner indicated that "her back pain was improving with the prednisone but she was instructed to stop this on [the previous] Friday so that she could have [] recommended immunizations (flu shot and Pneumovax) prior to starting Rituxan per Mayo Clinic recommendations." *Id.* at 496. Petitioner stated that since stopping her prednisone, she had developed some lower left extremity weakness and her right lower extremity weakness and pain had worsened. *Id.* Petitioner received the influenza and pneumococcal 23 polysaccharide vaccine. *Id.* Given the severity of Petitioner's symptoms, she was instructed to resume taking prednisone the next day after receiving her immunizations. *Id.*

  *b. Medical Records: post-vaccination*

In the early morning hours of October 24, 2014, Petitioner's husband called Dr. Dimaggio's office and reported that Petitioner received:

---

[15] Imuran is a "trademark for preparations of azathioprine." *Dorland's* at 925. Azathioprine is used as, among other things, "a disease-modifying antirheumatic drug for treatment of severe, progressive rheumatoid arthritis . . . ." *Dorland's* at 187.

[16] Paroxysmal flexor spasms refer to "a sudden recurrence or intensification of symptoms . . . a spasm or seizure . . . " in any muscle that flexes a joint. *Dorland's* at 717, 1384.

[17] Tegretol is a "trademark for preparations of carbamazepine." *Dorland's* at 1877. Carbamazepine is "an anticonvulsant and antineuralgic, used in the treatment of pain associated with trigeminal neuralgia and in epilepsy manifested by tonic-clonic and partial seizures[.]" *Dorland's* at 287.

[18] Rituximab is the generic name for "Rituxan" and may be used interchangeably. *Dorland's* at 1650. Rituximab is defined as "a chimeric murine/human monoclonal antibody . . . in the treatment of [] non-Hodgkin lymphoma[.]" *Id.*

a pneumonia shot two days ago and since then she has deteriorated – legs are not working well at all and pain has increased. Tonight[,] she has taken Tramadol with no relief. She states she gets the most relief from prednisone[] but has taken her max dose for today already. She is asking if she can take more.

Pet'r's Ex. 2a at 527. The on-call doctor deferred treatment until speaking with Petitioner's neurologist. *Id.* at 529. During a follow-up call later that day, the on-call nurse noted "[Petitioner] states that she had worsening leg symptoms when she came off oral steroids but after her flu and pneumonia shots the leg symptoms are even worse." *Id.* at 516. Petitioner further reported "her legs feel 'dead' since getting the pneumonia and flu shot yesterday." *Id.* at 517. In response, between October 24 through October 28, 2014, Petitioner underwent a five-day course of methylprednisolone infusions. *Id.* at 530. On October 28, 2014, the final day of treatment, Petitioner reported that her "[l]eft foot and left leg improved in strength since starting infusion[s] last Friday [October 24, 2014]." *Id.* at 537. She also indicated her "[r]ight leg is feeling sensation more now compared to prior to treatment [and her b]ladder control [is] improving." *Id.*

On October 29, 2014, Petitioner presented to rheumatologist Dr. Carol Cox at the request of Dr. Frost, for an evaluation regarding immunosuppressive therapy for management of her NMO. *Id.* at 546–47. Dr. Cox and Petitioner discussed possible immunosuppressive therapy, including treatment with Rituxan. *Id.* During this visit, Dr. Cox noted "[Petitioner] had a reaction to the pneumonia shot." *Id.* at 547. Dr. Cox further noted "[Petitioner] reports that her numbness persists from the waist down but she has been able to regain some movement of the left leg. Her bladder control is improving." *Id.* Dr. Cox indicated that "[g]iven her clinical course . . . it is most appropriate to start her on Rituxan given the more prompt nature of response." *Id.* at 548. Petitioner received her first Rituxan infusion on November 5, 2014. *Id.* at 566.

Petitioner established care with a new neurologist, Dr. Michael Snyder, on January 16, 2015. *Id.* at 622. At the time she presented to Dr. Snyder, Petitioner was on a slow prednisone taper to help manage her symptoms. *Id.* at 625. Dr. Snyder's impression was that Petitioner had seropositive NMO, spastic quadriparesis with gait impairment, and lower extremity spasticity. *Id.* at 624. Dr. Snyder lowered Petitioner's prednisone dose and recommended Petitioner continue Rituxan infusions every six months. *Id.* He further instructed her to continue with physical therapy, consider treatment with Baclofen "if spasticity worsens or starts to bother her more," and to follow-up in three months." *Id.* Petitioner followed up with Dr. Snyder on April 9, 2015. *Id.* at 655. During this visit, Petitioner reported she was able to walk one-hundred feet with a walker. *Id.* at 655–56. Dr. Snyder noted that since her last visit, Petitioner had slowly tapered "completely" off prednisone "and has not clearly noticed worsening since discontinuing." *Id.* at 655. However, he also indicated Petitioner had persistent weakness and sensory disturbance in her lower extremities. *Id.* at 657. Dr. Snyder recommended Petitioner continue with Rituxan. *Id.*

On May 13, 2015, Petitioner received another Rituxan transfusion. *Id.* at 671. She reported "feel[ing] well and [] no new issues since her last infusion." *Id.* On May 18, 2015, Petitioner followed up with her ophthalmologist and reported "[n]o concerns with her eyes or vision[.]" *Id.* at 683–84.

Several months later, on September 24, 2015, Petitioner had a follow-up visit with Dr.

Weinshenker at the Mayo Clinic. Pet'r's Ex. 4 at 30. During this visit, Dr. Weinshenker indicated that "[s]ince starting [Rituxan], [Petitioner] has had no further attacks of optic neuritis, myelitis, or other new neurologic symptoms." *Id.* Upon exam, Dr. Weinshenker noted "[Petitioner] ha[d] mildly reduced hip flexor strength of both legs[,] . . . moderate to severe spasticity of both legs, left greater than right, and [] mild spasticity of the left upper extremity." *Id.* at 31. He further noted that, as previously detected, Petitioner had "moderately to severely reduced vibration sense below the knees[.]" *Id.* Overall, Dr. Weinshenker indicated Petitioner's sensory exam had improved since their last visit but she was still "significantly more impaired functionally." *Id.* Dr. Weinshenker recommended further Rituxan infusions to manage her symptoms. *Id.* at 32.

Almost a year later, on August 8, 2016, Petitioner returned to Dr. Weinshenker for follow-up. *Id.* at 24. Dr. Weinshenker noted that Petitioner had suffered "no further attacks of optic neuritis and myelitis." *Id.* At this visit, Petitioner's "major complaint [was] discomfort in her legs and spine." *Id.* Dr. Weinshenker determined Petitioner had "a stable residual myelopathy." *Id.* at 25. He recommended Petitioner continue Rituxan infusions every six months and suggested a follow-up in one year. *Id.* On May 17, 2017, Petitioner emailed Dr. Weinshenker alerting him that she was "seriously thinking of discontinuing the [Rituxan] infusions and not replacing it with anything else . . . ." *Id.* at 20. Dr. Weinshenker strongly advised Petitioner against this course of action, noting that she would likely relapse. *Id.* at 19. He told her that she "should not interpret the fact that [she] was doing well as indicati[on] that [she] was cured." *Id.*

On May 31, 2017, Petitioner presented to another neurologist, Dr. Matthew Raday, for follow-up. Pet'r's Ex. 2b at 1302, ECF No. 12-3. Drs. Snyder and Frost were no longer with the practice. *Id.* During this visit, Dr. Raday noted Petitioner was "clinically stable on Rituxan." *Id.* at 1303. Petitioner returned to Dr. Raday on November 16, 2017. *Id.* Dr. Raday indicated that Petitioner "elected to go off Rituxan despite recommendations to remain on it." *Id.* Petitioner reported she "continue[d] to have right arm pain[,]" and "pain in the left distal upper medial arm." *Id.* However, Petitioner maintained she had this "for at least a couple years[,]" prior to discontinuing Rituxan. *Id.* Petitioner reported "[n]o changes to vision, if anything she feels that her vision has been better." *Id.* Dr. Raday noted his recommendation against the discontinuation of Rituxan and advised Petitioner to continue Rituxan infusions to avoid "new neurological deficits of which she may never recover from." *Id.* at 1306. Nonetheless, Petitioner maintained her refusal to resume treatment and acknowledged her awareness of the possible long-term problems this presented, including permanent deficits. *Id.* Dr. Raday noted Petitioner's intention to keep him apprised of her symptoms. *Id.*

Petitioner had another follow-up with Dr. Weinshenker on November 27, 2017. Pet'r's Ex. 4 at 8. Dr. Weinshenker noted Petitioner's physical findings were unchanged since her last evaluation on August 8, 2016. *Id.* at 9, 24. He also noted Petitioner's decision to forego Rituxan infusions due to her concern about the risks to her liver, kidney, and immune system. *Id.* at 9. Dr. Weinshenker informed Petitioner that he did not think this decision was "wise" as cessation of Rituxan "leaves [Petitioner] open for recurrent attacks of [NMO]." *Id.* Dr. Weinshenker attempted to reassure Petitioner "that there was no significant risk to her liver or kidney[s], and the potential effects on her immune system are usually not clinical[ly] important and associated with a low rate of serious or opportunistic infection." *Id.* His efforts were unsuccessful. Petitioner promised to keep Dr. Weinshenker informed of her symptoms and planned to follow up in a year. *Id.* No other

medical records have been submitted.

### c. Preliminary consultations with Petitioner's experts

According to Petitioner's billing records, Petitioner contacted Dr. Yehuda Shoenfeld, an expert in autoimmunity, on June 7, 2019, regarding a preliminary consultation and "possible opinion." Pet'r's Mot. for AFC at 1–2; *see also* Pet'r's Mot. for AFC at Ex. 2, pg. 2, ECF No. 38-2. Notably, by the time Petitioner contacted Dr. Shoenfeld, she had missed her May 1, 2019 expert report deadline by one month and six days. *See* Order, ECF No. 27. Nonetheless, Petitioner indicated that Dr. Shoenfeld provided her with medical literature informing her that "[i]nfluenza[] vaccination[s] could cause optic neuritis or the aggravation of [the] same[.]" Pet'r's Mot. for AFC at 2. Petitioner cited to two articles submitted to her by Dr. Shoenfeld in her motion for attorneys' fees and costs. *Id.* at 2–3. However, the articles themselves have not been filed for the record, and the citations included within Petitioner's motion are incomplete. *See id.* Dr. Shoenfeld did not prepare a formal report, as he indicated that input from an expert in neurology would be necessary before he could adequately do so. *Id.* Dr. Shoenfeld billed $2,000 for his services. *Id.* at 2.

Petitioner consulted with neurologist Dr. Marcel Kinsbourne on July 27, 2019. *Id.* at Ex. 2, pg. 2. Petitioner indicated that after Dr. Kinsbourne reviewed her file, he advised that:

> as [Petitioner's] medi[c]al team had discontinued steroid treatment of her [optic neuritis] condition on the Friday before the vaccination and as her report to her doctors indicated that[,] deterioration of her legs started shortly thereafter and before the vaccination. Therefore[,] removal of steroid treatment was a non-vaccine cause which was almost as likely as the vaccine to be responsible for her injury. Her deterioration was progressing before she was given the vaccination . . . it would be extremely difficult to distinguish between the effect of the withdrawal of steroid treatment and the effect of the vaccination.

Pet'r's Mot. for AFC at 3–4. Dr. Kinsbourne did not prepare a formal report. *Id.* at 4. He billed for three hours of work at $500 per hour, for a total of $1,500. *Id.* Based on the preliminary opinions of both experts, Petitioner "determined that pursuing this matter further would be expensive, had only a limited chance of success[,] and could be deemed unreasonable." *Id.*

## III.   Arguments regarding Petitioner's Motion for Attorneys' Fees and Costs

### a. Petitioner's Argument

As the issue of reasonable basis had previously been raised in this case, Petitioner addresses the issue in her motion for attorneys' fees and costs. Pet'r's Mot. for AFC at 3. Petitioner argues that reasonable basis existed to pursue this case. *Id.* To establish reasonable basis, Petitioner argues that the evidence provided in this case shows she could satisfy her burden under *Althen*.[19] *Id.* at 2–

---

[19] Petitioner erroneously argues that reasonable basis existed in this case because the evidence shows she could meet her burden under *Althen*. In doing so, Petitioner misstates both the standard used to evaluate reasonable basis and the standard applicable to significant aggravation claims. To establish a causal link between a vaccine and a claimed injury, the Federal Circuit set forth a three-pronged test in *Althen. Althen*

3 (citing *Althen v. Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)). In support of that assertion, Petitioner cites to some of the articles provided by Dr. Shoenfeld. *Id.* at 2. Petitioner argues these articles informed her that "[i]nfluenza[] vaccination[s] could cause optic neuritis or the aggravation of [the] same[.]" *Id.* Petitioner indicates "[t]he articles established that many medical researchers agreed that [optic neuritis] following an influenza vaccination was a known phenomena [sic]." *Id.* Petitioner argues these articles indicated she could satisfy her burden under the first and third prongs of *Althen. Id.*

Petitioner further states that her medical records show "[b]efore the vaccinations, [she] was on prednisone to control her symptoms and was able to walk and function." *Id.* at 3. However, the day after the vaccinations, her records indicate that "she had no use of her legs[.]" *Id.* Petitioner argues that the loss of the use of her legs the day after she received her vaccine is attributed to the flu vaccination. *Id.* Petitioner further argues that "[a]s [her] prior condition is known to be one which could be caused by the [flu] vaccine, it is logical that exposure to this vaccine could also aggravate that condition." *Id.* Based on this, Petitioner argues pursuant to the second prong of *Althen,* "that the vaccine was the but[-]for cause of her temporary complete loss of the use of her legs after the vaccination, and her continued significantly aggravated condition . . . ." *Id.* Petitioner further claims she demonstrated she suffered from the "increased disability [aggravated by the vaccine] . . . for over a year[.]" *Id.* As such, Petitioner argues "the[re] was reasonable basis to pursue this case as of the time it was transferred to [counsel's] office." *Id.*

Finally, Petitioner argues that "[d]ue to the [her] medical history, a significant amount of time was consumed [by counsel] to understand that history and to research the various notations in the record to determine their significance." *Id.* at 5. Petitioner also argues that "the literature forwarded to [counsel] by Dr. Shoenfeld [sic] had to be reviewed and understood." *Id.* Petitioner states that "[t]he records were then reviewed [] to remove all claims which seemed excessive." *Id.* Based on these actions, Petitioner argues that the request for fees and costs is "accurate" and there was a reasonable basis to pursue this case "as of the time it was transferred to [counsel's] office."

---

*v. Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). The *Althen* test requires a petitioner to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *See id.* (internal citations omitted). However, in this case, Petitioner asserts that the flu vaccine significantly aggravated her pre-existing NMO. The United States Court of Appeals for the Federal Circuit has held that the *Loving* test is the correct framework for evaluating an off-Table significant aggravation claim. *See W.C. v. Health & Hum. Servs.*, 704 F.3d at 1352, 1357 (Fed. Cir. 2013) (citing *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009)). The *Loving* test incorporates the three-pronged test set forth in *Althen* and adds three additional prongs, which Petitioner must show by a preponderance of the evidence: (1) the person's condition prior to administration of the vaccine; (2) the person's current condition (or the condition following the vaccination if that is also pertinent); and (3) whether the person's current condition constitutes a "significant aggravation" of the person's condition prior to vaccination. *Loving*, 86 Fed. Cl. at 144. Therefore, Petitioner's reliance on *Althen* is incorrect and misplaced. However, even if Petitioner had instead applied the standard established in *Loving*, causation is not determinative in a finding of reasonable basis. Therefore, Petitioner's argument that this case had a reasonable basis because she could show entitlement to compensation under *Loving* is inapplicable.

11

[20] *Id.* at 3, 5. Petitioner did not file a reply to Respondent's response.

### b. Respondent's Argument

On January 31, 2020, Respondent filed a response to Petitioner's motion for attorneys' fees and costs. Resp't's Resp. Respondent opposes Petitioner's motion for fees and costs, arguing that "this case lacked a reasonable basis when it was filed." *Id.* at 5. Further, in the alternative, Respondent opposes an award of attorneys' fees and costs for work performed after the Rule 5 status conference on October 24, 2018. *Id.* at 8. Respondent indicates, at that time, Petitioner was informed that "the claim presented questions about the reasonable basis going forward, 'particularly if no expert' report was obtained." *Id.* No expert report was obtained.

Respondent indicates that "[t]o 'have a reasonable basis,' a claim must, at a minimum, be supported by medical records or medical opinion." *Id.* at 6 (quoting *Everett v. Sec'y of Health & Hum. Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Fed. Cl. Spec. Mstr. Feb. 7, 1992)). Respondent notes that in a reasonable basis inquiry, the Court looks not at the likelihood of success of the claim, but rather assesses the claim's feasibility. *Id.* (citing *Perreira v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994)). Respondent posits that mere speculation that a petitioner could or might establish a claim, alone, is not enough to establish reasonable basis; it must be supported by at least medical records. *Id.* (citing *McKellar v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 303, 303 (2011); *Everett*, 1992 WL 35863, at *2)).

Respondent argues Petitioner's motion should be denied because "the medical records do not support [P]etitioner's claim that she suffered a significant aggravation of her underlying NMO[,]" as a result of the flu vaccine she received on October 22, 2014. *Id.* at 7; *see also* Resp't's Report at 18, 19. Respondent argues it was already documented that Petitioner "suffers from a disease that is a relapsing and remitting condition with a variable prognosis." *See id.* Respondent notes Petitioner's medical records show that "[she] had not been taking her prescribed medication [for her NMO] around the time that she reported worsening of her [NMO] symptoms." Resp't's Resp. at 7. Specifically, Respondent indicates that Petitioner stopped taking prednisone five days before receipt of the vaccines. *Id.* at 8. She then had worsening of her symptoms on the very same day she received the vaccines. *Id.* Thus, Respondent argues, "[P]etitioner's records show[] that her alleged symptoms of worsening began prior to receipt of the vaccines on October 22, 2014, and were related to stopping her prednisone." *Id.* Therefore, it is apparent Petitioner's medical records do not provide support for her claim for significant aggravation and cannot support a finding of

---

[20] In *Simmons*, the Federal Circuit stated that "while good faith on behalf of [P]etitioner's counsel is a subjective inquiry, the question of whether there was reasonable basis for the claim is an objective inquiry." *Simmons v. Sec'y of Health & Hum. Servs.*, 128 Fed. Cl. 579, 582 (2016), *aff'd*, 875 F.3d 632 (Fed. Cir. 2017). The reasonable basis inquiry is unrelated to the conduct of a petitioner's counsel prior to filing a claim. *Simmons*, 875 F.3d at 635. In *James-Cornelius,* the Federal Circuit reiterated its prior holding in *Cottingham* and *Simmons,* that a reasonable basis analysis is limited to a review of objective evidence. *James-Cornelius v. Sec'y of Health & Hum. Servs.,* No. 2019-2404, 2021 WL 68806 (Fed. Cir. Jan. 8, 2021) (citing *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344–45 (Fed. Cir. 2020)); *Simmons*, 875 F.3d at 635. Subjective considerations, such as counsel's views on the adequacy of a complaint, are not considered in a determination of reasonable basis. *See id.* Therefore, any arguments made by Petitioner regarding counsel's subjective actions and beliefs which affected how this case proceeded will not be considered in my determination of reasonable basis.

reasonable basis. *Id.*

Respondent further argues that even if Petitioner could show she suffered an aggravation of her NMO, the onset of the worsening of her symptoms occurring within hours of vaccination was an unreasonable timeframe within which to ascribe causation. *Id.* at 7. Therefore, based on Petitioner's medical records, Respondent argues that there was not enough support filed with this claim, or at any other time, to support a finding of reasonable basis. *Id.* at 8.

Finally, Respondent posits that "[p]rior to accepting a case, an attorney should be able to distinguish a case that has reasonable underpinnings from one that does not." *Id.* at 6 (quoting *Murphy v. Sec'y of Health & Hum. Servs.*, 30 Fed. Cl. 60, 62 (1993), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995)). Respondent maintains that "an attorney should use reasoned judgment in determining whether to accept and pursue a claim." *See id.* However, the reasonable basis analysis must turn on whether there is evidentiary support for the claim, not whether counsel acted reasonably in filing the petition. *Id.* at 6 (citing *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017)).

Respondent argues "[P]etitioner's counsel had a duty to determine whether this case had reasonable factual underpinnings prior to filing it[]" and he violated that duty. *Id.* at 7–8 (citing *Murphy*, 48 F.3d at 1236). Respondent reiterates his arguments presented above and maintains that Petitioner's medical records and preliminary medical opinions show that her alleged worsening of symptoms began prior to her vaccinations and were related to her stopping prednisone. *Id.* at 8. Therefore, Petitioner's medical records do not provide support for the claim in her petition. *Id.* As such, Respondent argues Petitioner's medical records do not support a reasonable basis to file this claim, or for counsel to pursue it. *Id.*; *see also Everett*, 1992 WL 35863, at *2. Therefore, Petitioner's motion for attorneys' fees and costs must be denied. Resp't's Resp. at 7–8.

## IV. Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, a special master may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1); *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013).

### a. Good Faith

"Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). Petitioners act in "good faith" if they filed their claims with an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). It is, roughly, "'an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage.'" *Turner*, 2007 WL 4410030, at *5 (quoting Black's Law Dictionary 623 (5th ed.1979)). It is presumed and can be rebutted by direct evidence of bad faith. *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (Fed. Cl. 1996) (noting that in the absence of evidence of bad faith, the special master was justified in presuming the existence of good faith). Thus, so long as a petitioner had an honest belief that her claim could succeed, the

good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 99-3277, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1992)); *Turner*, 2007 WL 4410030, at *5. It can be present when the petition is filed and can be lost when the claim is not maintained in good faith. *See Perreira*, 33 F.3d at 1377. Conduct of counsel may be relevant on the issue of good faith but plays no role in an evaluation of reasonable basis. *Simmons*, 875 F.3d at 632. Respondent does not expressly contest that this petition was filed in good faith. *See, e.g.*, Resp't's Resp. Without evidence of bad faith, I find that the good faith standard is met in this case.

  b.  *Reasonable Basis*

    Even though I have determined Petitioner's claim was filed in good faith, to receive an award of attorneys' fees and costs, Petitioner must also show her claim was brought with a reasonable basis. A petitioner can receive an award of fees and costs even if her claim fails, but to do so, she must demonstrate the claim was brought with a reasonable basis through objective evidence supporting "the *claim* for which the petition was brought." *Simmons*, 875 F.3d at 635; *see also Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar*, 101 Fed. Cl. at 303). "Reasonable basis" is not explicitly defined in the Vaccine Act or Rules. Deciding whether a claim has a reasonable basis "is within the discretion of the Special Master . . . ." *Simmons*, 875 F.3d at 632 (internal citations omitted). In a reasonable basis inquiry, a judicial officer looks not at the likelihood of success of the claim, but instead assesses the claim's feasibility. *Perreira*, 33 F.3d at 1377. Reasonable basis can be present when a case is filed and can be lost as more information comes to light. *Chuisano*, 116 Fed. Cl. at 289.

    A reasonable basis determination is based on a totality of the circumstances inquiry that can be satisfied by reviewing the factual, medical, and jurisdictional support for a claim.[21] *See Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1344–45 (Fed. Cir. 2020); *Chuisano*, 116 Fed. Cl. at 288. The amount of objective evidence that satisfies reasonable basis is more than a scintilla of evidence but less than preponderant evidence. *Cottingham*, 971 F.3d at 1344–45 (clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion."). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Cortez v. Sec'y of Health & Hum. Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *McKellar*, 101 Fed. Cl. at 303–04; *Perreira*, 33 F.3d at 1377.

    Petitioners must "affirmatively demonstrate [the] reasonable basis" of their claim through some objective evidentiary showing. *McKellar*, 101 Fed. Cl. at 305. Such a showing "must, at a minimum, be supported by medical records or medical opinion." *Everett*, 1992 WL 35863, at *2. This means that some supporting documentation of a claim must always be offered if the claim is to be viable. *Id.* Appellate authorities have held this includes the factual basis of the claim and any medical evidence supporting that claim. *See Cottingham*, 971 F.3d at 1344–45; *see also Chuisano*, 116 Fed. Cl. at 287 (finding that "the reasonable basis inquiry is broad enough to encompass any material submitted in support of the claim at any time in the proceeding, whether with the petition

---

[21] The jurisdictional support for Petitioner's claim is not at issue in this case and therefore, will not be addressed.

or later."). Indeed, a petitioner's "burden has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121 at *6 (Fed. Cl. 2018). For purposes of establishing reasonable basis, medical records can support causation even where the records provide only circumstantial evidence of causation. *Cottingham*, 971 F.3d at 1346 (citing *Harding v. Sec'y of Dep't of Health & Hum. Servs.*, 146 Fed. Cl. 381, 403 (Fed. Cl. 2019)); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.,* No. 2019-2404, 2021 WL 68806 at *9 (Fed. Cir. Jan. 8, 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis."). After a review of the record, considering the totality of the circumstances, I find Petitioner's case lacked a reasonable basis at the time it was filed.

## V.    Analysis

After reviewing the entire record, I find that Petitioner did not have a reasonable basis to file this claim. As an initial matter, Petitioner attempted to demonstrate reasonable basis by arguing that the medical literature provided to her in this case could satisfy prongs one and three of *Althen*. However, Petitioner misrepresents the standard used for a determination of reasonable basis. A finding of reasonable basis is not dependent on Petitioner's ability to meet the entitlement standard under *Althen* or *Loving*. That burden would undercut the 'petitioner friendly' nature of the Program by discouraging counselors from taking on claims of novel nature. Indeed, in the instant case, Petitioner voluntarily dismissed her claim based on her own belief that she could not demonstrate causation and therefore lacked "reasonable cause to proceed further." *See* Pet'r's Mot. to Dismiss at 2. Therefore, Petitioner's arguments regarding her ability to meet her burden under *Althen* are misplaced. Whether Petitioner's claim had a reasonable basis from the time of filing through dismissal will be analyzed using the applicable legal standard under *Perreira,* wherein the Federal Circuit established that in a reasonable basis inquiry, the Court assesses the claim's feasibility, not the likelihood of success of the claim. *Perreira*, 33 F.3d at 1377. The Court further discussed this standard in *Cottingham* and held that to meet this burden, Petitioner must present more than a mere scintilla but less than preponderant evidence to support her claim. *Cottingham*, 971 F.3d at 1346. To make a determination regarding reasonable basis, I will place Petitioner's arguments into the correct legal framework and analyze the factual and medical support for her claim. *See id.* at 1344–45.

In support of reasonable basis, Petitioner argues her medical records show she could meet her burden under *Althen* and that the flu vaccine caused the significant aggravation of her NMO. However, I find that Petitioner's medical records provide insufficient support for her claim that the flu vaccine caused the significant aggravation of her NMO.

Specifically, at the time of Petitioner's flu vaccine on October 22, 2014, she had been receiving treatment for her NMO since January 1, 2014. It is undisputed that steroids, including prednisone, have been proven effective at improving Petitioner's condition. It is also undisputed that Petitioner's cessation of prednisone has been the direct cause of her worsening NMO symptoms on previous occasions. For example, Petitioner's interactions with Dr. Frost reveal that she was "slowly improving" on a prednisone taper up until September 4, 2014, but she chose to defer further steroid treatment after this visit. Pet'r's Ex. 2a at 442. By October 13, 2014, Dr. Nasr noted Petitioner's NMO symptoms had worsened to the point that she got flexor spasms every

time she tried to stand. Pet'r's Ex. 4 at 47–48. As a result, Petitioner resumed prednisone. *Id.*; *see also* Pet'r's Ex. 2a at 495–96. Later that day, Dr. Weinshenker discussed available treatment options with Petitioner and recommended treating her symptoms with Rituxan, an alternative to prednisone. Pet'r's Ex. 4 at 52. However, prior to starting treatment with Rituxan, Dr. Weinshenker instructed Petitioner to receive the flu vaccine. *Id.* To do so, he ordered Petitioner to cease taking prednisone. *Id.*; *see also* Pet'r's Ex. 2a at 495–96. On October 22, 2014, just prior to her receipt of the flu vaccine, Petitioner reported to Dr. Dimaggio that she indeed stopped taking prednisone in preparation for the vaccine, but in doing so, her NMO symptoms had worsened. Pet'r's Ex. 2a at 495–96. Dr. Dimaggio instructed Petitioner to resume prednisone following the flu vaccine to alleviate her worsening NMO symptoms. *Id.* Petitioner did so, but the worsening of her symptoms had already progressed before the prednisone took effect. *Id.* at 527–29. As a result, Petitioner then underwent an intensive, five-day course of methylprednisolone infusions and her NMO symptoms improved. *Id.* at 530.

Most notably, while not a medical record, Petitioner's evidence submitted through her own motion to dismiss does not lend sufficient support for a finding of reasonable basis. *See Chuisano*, 116 Fed. Cl. at 287. Petitioner conceded that "the termination of steroid treatment five days prior to the vaccination, had already caused a return of symptoms of her pre[-]existing disease." Pet'r's Mot. to Dismiss at 2. As a result, there is insufficient evidence that Petitioner's flu vaccine had any impact on her NMO. Therefore, Petitioner's evidence does not provide sufficient factual or medical support for her claim that the flu vaccine significantly aggravated her NMO. In fact, her evidence is contradictory.

Even if Petitioner's treating physicians had noted a temporal association between the vaccine and the worsening of her injury, none of Petitioner's treating physicians attributed her worsening NMO symptoms directly to the flu vaccine.[22] *See* Pet'r's Exs. 2a–6. The lack of an express medical opinion on causation in this case does not by itself negate my finding of reasonable basis. *See James-Cornelius*, 2021 WL 68806 at *9–10. Yet, while an express medical opinion on causation is not required in the Program, several of Petitioner's treating physicians attributed the worsening of her symptoms directly to her cessation of prednisone. Such attributions are relevant to my determination of reasonable basis because they not only fail to provide support for Petitioner's claim, this evidence contradicts her assertion of vaccine causation. This conclusion is further substantiated by Petitioner's medical records in which treating physicians expressly noted that her NMO condition deteriorated without steroids, including prednisone. As a result, they encouraged Petitioner to remain on steroids to avoid regression. For example, in May 2017, Petitioner stated to Dr. Weinshenker her intention to stop steroid infusions out of fear of the negative side-effects from prolonged use. Pet'r's Ex. 4 at 20. In response, Dr. Weinshenker vehemently warned her that stopping such treatment would likely cause her to "relapse." *Id.* He went so far as to say Petitioner "should not interpret the fact that she was doing well as indicating

---

[22] While none of Petitioner's treating physicians attributed her worsening NMO symptoms to the flu vaccine, Dr. Cox did note on October 29, 2014, that "[Petitioner] had a reaction to the pneumonia shot." Pet'r's Ex. 2a at 547. However, as previously indicated, the pneumococcal vaccine is not covered by the Vaccine Table and Petitioner conceded that the Court does not have subject matter jurisdiction over Petitioner's claims related to the pneumococcal vaccine. *See* Sched. Order at 1, ECF No. 20. Therefore, Dr. Cox's notation regarding the pneumococcal vaccine is immaterial to Petitioner's claim related to the flu vaccine causing the significant aggravation of her NMO.

that she was cured." *Id.* at 19. It is clear that the facts of this case belie Petitioner's significant aggravation claim. Although medical records can support causation even where the records provide only circumstantial evidence of the same, Petitioner's medical records here indeed rebut the basis for her claim. *See Cottingham*, 971 F.3d at 1346; *Harding*, 146 Fed. Cl. at 403. Therefore, I find Petitioner's medical records do not provide sufficient support for her claim. As Petitioner's claim is contradicted by her medical records and opinions from treaters, her argument in favor of reasonable basis must fail.

Further, after Mr. McHugh took over the case, Petitioner sought the input of two experts to provide support for her significant aggravation claim. Her efforts were unavailing. In fact, Petitioner contends that when she sought the opinion of Dr. Shoenfeld, he provided her with medical literature informing her that the flu vaccine could cause the significant aggravation of her NMO. However, these articles were not filed, and Dr. Shoenfeld did not provide an opinion in support of Petitioner's claim, because he felt an expert in neurology was needed before he could do so. *See* Pet'r's Mot. for AFC at 3–4. Petitioner then consulted with neurologist Dr. Kinsbourne who noted that Petitioner's doctors "discontinued steroid treatment of her [optic neuritis] condition on the Friday before the vaccination and as her report to her doctors indicated that deterioration of her legs started shortly thereafter and before the vaccination." *Id.* Dr. Kinsbourne continued, "removal of steroid treatment was a non-vaccine cause which was almost as likely as the vaccine to be responsible for her injury. Her deterioration was progressing before she was given the vaccination." *Id.* Dr. Kinsbourne does not explain what he meant by "almost as likely" or why he came to that conclusion over its inverse. Further, he does not distinguish the role that the pneumococcal vaccine played in Petitioner's condition.

To establish causation in the Program, a petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999). A showing of but-for causation is also applicable to significant aggravation claims. If a petitioner proves a *prima facie* case of causation, the burden indeed switches to respondent to establish alternate causation. *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1150 (Fed. Cir. 2007) (noting that "the government bears the burden of establishing alternative causation . . . once the petitioner has established a *prima facie* case."). In the context of reasonable basis, Petitioner must provide objective medical or factual evidence to support vaccination as the but-for cause of her injury. In this case, Dr. Kinsbourne's preliminary statement does not provide medical support that the flu vaccine was a substantial factor in the aggravation of Petitioner's injury, given his concession that the relapse in her symptoms started prior to her receipt of the vaccine. Further, because Petitioner did not establish a *prima facie* case, and she conceded that she lacked "reasonable basis to proceed further," the burden did not shift to Respondent to demonstrate alternative causation. *See Sharpe v. Sec'y of Health & Hum. Servs.*, No. 14-65V, 2018 WL 7625360 (Fed. Cl. Nov. 5, 2018), *aff'd*, 142 Fed. Cl. 630 (2019), *aff'd in part, vacated in part, remanded*, 964 F.3d 1072, 1082 (Fed. Cir. 2020) (finding that "[i]n any vaccine case, if the evidence as a whole ultimately shows that the vaccine was not a substantial factor in causing the petitioner's injury, then compensation should be denied."); *see also Oliver v. Sec'y of Health and Hum. Servs.*, No. 10-394V, 2017 WL 747846, at *23 (Fed. Cl. Spec. Mstr. Feb. 1, 2017) (holding that assessing an off-Table significant aggravation claim necessarily involves asking whether the individual's "clinical course and outcome [would have been] any different than it would have been if [she] had not been

vaccinated[.]”); *Locane v. Sec'y of Health & Hum. Servs.*, No. 99–599V, 2011 WL 3855486, *10–11 (Fed. Cl. Spec. Mstr. Feb. 17, 2011), *aff'd*, 99 Fed. Cl. 715 (Fed. Cl. 2011), *aff'd*, 685 F.3d 1375 (Fed. Cir. 2012) (affirming the special master's finding that petitioner's condition was not inconsistent with the disease generally and not affected by the vaccinations). Dr. Kinsbourne's preliminary statement does not lend support to a burden shift because it highlighted that Petitioner's condition was deteriorating prior to the vaccine and it provided no explanation of how the vaccine was a substantial factor in the worsening of her condition. *See Shyface*, 165 F.3d at 1352–53. In fact, Dr. Kinsbourne's opinion merely restates what Petitioner's medical records already revealed and the same insurmountable hurdles to compensation remained. The preliminary expert opinions in this matter were largely unnecessary and did not lend further support for a finding of reasonable basis. Therefore, Petitioner is unable to offer support for her own assertion that the flu vaccine caused the significant aggravation of her NMO. *See Cortez*, 2014 WL 1604002, at *5; *McKellar*, 101 Fed. Cl. at 303–04; *Perreira*, 33 F.3d at 1377.

## VI.    Conclusion

I find that Petitioner has not alleged facts sufficiently supported by objective evidence to demonstrate a reasonable basis for her claim. To support a finding of reasonable basis, Petitioner must present more than her own assertion that a vaccine caused or significantly aggravated the alleged injury. Petitioner's claim is insufficiently supported by medical records or opinions. When the complete record is considered, including Petitioner's own statements to treating physicians, there is insufficient evidence for a finding of reasonable basis. Therefore, I hereby **DENY** Petitioner's motion for attorneys' fees and costs. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court is directed to enter judgment herewith.[23]

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[23] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.